**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **MICHAEL A. LORD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:11-CV-00356** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Michael Lord appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[1] (*See* Docket # 1.)  For the following reasons, the

Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Lord applied for DIB and SSI in April 2007 alleging disability as of June 1, 2000. (Tr.

25, 96-99, 218.)  He was last insured for DIB on June 30, 2008 (Tr. 198), so he must establish

that he was disabled as of that date for purposes of the DIB claim. *See Stevenson v. Chater*, 105

F.3d 1151, 1154 (7th Cir. 1997) (explaining that a claimant must establish that he was disabled

as of his date last insured in order to recover DIB benefits).  The Commissioner denied his

application initially and upon reconsideration. (Tr. 100-14.)  After a timely request for a hearing,

---

[1] All parties have consented to the Magistrate Judge. (Docket # 14); *see* 28 U.S.C. § 636(c).

a video hearing was held on December 10, 2009, before Administrative Law Judge ("ALJ") John

Pope, at which Lord (who was represented by counsel), his friend, and a vocational expert

("VE") testified. (Tr. 48-95.)  On March 9, 2010, the ALJ rendered an unfavorable decision to

Lord, concluding that he was not disabled because he could perform a significant number of

sedentary jobs in the economy. (Tr. 25-34.)  The Appeals Council denied his request for review,

at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 1-18.)

Lord filed a complaint with this Court on October 11, 2011, seeking relief from the

Commissioner's final decision. (Docket # 1.)  In this appeal, Lord alleges that the ALJ erred by:

(1) failing to properly account for his moderate deficiencies in maintaining concentration,

persistence, or pace in his residual functional capacity ("RFC") and in the hypothetical posed to

the VE; (2) partially discrediting his symptom testimony; and (3) articulating that his Global

Assessment of Functioning ("GAF") score of 50 was consistent with the performance of

unskilled sedentary work.[2] (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3

("Opening Br.") 9-14.)

## II.  FACTUAL BACKGROUND[3]

### A.  Background

At the time of the ALJ's decision, Lord was forty-nine years old, had a ninth-grade

---

[2] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

[3] In the interest of brevity, this Opinion recounts only the portions of the 1,417-page administrative record necessary to the decision.

education, and had past relevant work as a mover. (Tr. 24, 33, 83.)  He alleges that he became disabled due to degenerative disk disease, peripheral neuropathy, carpal tunnel syndrome, depression, and a personality disorder. (Opening Br. 2.)

## B. Lord's Testimony at the Hearing

At the hearing, Lord testified that he lives with a friend in a one-story home. (Tr. 54-55.) He is able to drive a car and is independent with his self care. (Tr. 55, 72.)  His typical day includes caring for his dog; lying down for three to four hours to manage his pain; watching television; performing household tasks such as laundry, vacuuming, doing dishes, and preparing meals; and going to the store. (Tr. 63-66.)

As to why he cannot work, Lord complained of extreme lower back and groin pain; he described his back pain as constant "stabbing" and his groin pain as "sharp" and "burning." (Tr. 58, 70.)  He stated that in an effort to reduce his pain he takes numerous medications, receives monthly injections, and has participated in physical therapy. (Tr. 59-61.)  He reported that most days he experiences medication side effects of nausea, dizziness, and chills. (Tr. 62-63.)  Lord estimated that he could lift forty pounds; sit, stand, or walk for just forty-five minutes in an eight-hour workday; and would need to lie down for four to six hours in an eight-hour workday. (Tr. 71-72, 74-75.)  Lord also complained of psychological conditions that cause him to feel frustrated, have difficulty concentrating, and, at times, to want to hurt himself or others. (Tr. 67-69, 75.)  He stated that he has no family or friends, is not involved in any social clubs, and will easily "go off" on people.[4] (Tr. 68-69.)

---

[4] Lord's friend and landlord, Lillian Reynolds, also testified at the hearing, essentially corroborating his testimony. (Tr. 77-81.)

*C.  Summary of the Relevant Medical Evidence*

Starting in 2000, Lord from time to time sought treatment for various issues, including hand numbness, back and neck pain, and groin pain. (Tr. 920-1045, 1132-66.)

In January 2006, Lord saw Dr. Michael Holton for a consultative physical examination at the request of the Social Security Administration. (Tr. 296-99.)  He documented that Lord had a normal gait and station and had no difficulty walking on heels or toes or with tandem walking. (Tr. 297.)  There was palpable tenderness of the paravertebrals and some voluntary guarding of the hips on active range of motion testing. (Tr. 297.)  His strength and tone were normal in all four extremities with no evidence of atrophy or muscle spasm. (Tr. 297.)  Fine finger manipulations were performed with mild bilateral stiffness, and he was able to button, zip, and pick up a coin with either hand. (Tr. 298.)  Dr. Holton found that Lord could perform fine finger manipulations on an occasional or frequent basis, but not for prolonged repetitive periods. (Tr. 298.)  He diagnosed Lord with chronic low back pain with possible radiculopathy; chronic musculoskeletal pain of extremity joints, cannot exclude underlying degenerative joint disease; and history of carbon monoxide exposure without allegation of possible associated cognitive loss. (Tr. 298.)

That same month, Lord was given samples of Seroquel and Zoloft by Dr. Vijoy Varma, a psychiatrist. (Tr. 311, 315.)  In March, Dr. Varma observed that Lord was overactive, distractible, and had minimal insight and pressured speech. (Tr. 309-10.)  In April, Dr. Varma documented that Lord had fair insight but a depressed and anxious mood and affect. (Tr. 307-08.)  In December, Dr. Varma completed a discharge summary reflecting diagnoses of anxiety disorder, dysthymic disorder, and polysubstance dependence. (Tr. 305.)  The reason for

discharge was "no show," "dropped out," and "noncompliant." (Tr. 305-06.)

In May 2006, Lord underwent an L5-S1 fusion by Dr. Michael Arata. (Tr. 380, 580-83, 1132.) Because of an increase in post-operative pain, Dr. Arata referred Lord to Dr. David Stensland, a pain specialist. (Tr. 1132.) Dr. Stensland diagnosed Lord with low back pain status post L5-S1 fusion for discogenic pain proven by discography, constipation, depression, hypercholesterolemia, and hypertension. (Tr. 1133.) Dr. Stensland opined in June 2006 that Lord's pain reports appeared to be greater than one would anticipate based on the functional levels he demonstrated. (Tr. 676.)

In July 2006, Lord underwent a psychological consultative exam by Sherwin Kepes, Ph.D., a state agency psychologist. (Tr. 300-04.) He exhibited mostly normal orientation and memory; his judgment and common sense were not especially well developed, but also were not grossly compromised. (Tr. 301-02.) Testing was congruent with possible borderline intellectual functioning. (Tr. 303.) Dr. Kepes assigned a GAF score of 50. (Tr. 304.)

In August 2006, Dr. Stensland noted that Lord continued to have numbness in his right leg and hand and that he complained of pain between a "six" and an "eight" on a ten-point scale. (Tr. 662-63.) Yet, he ambulated without difficulty and exhibited no significant pain behavior. (Tr. 663.) Also in August, Dr. Arata documented that Lord's x-rays looked fine and that his fusion was "coming along well." (Tr. 665, 673.) In October, Lord was administered a caudal epidural injection. (Tr. 887, 916-18.) In November, Dr. Stensland observed that Lord's range of motion in his lumbosacral spine was within functional limits. (Tr. 424-25.) The only functional limitation that Dr. Stensland assigned to Lord was no truck driving. (Tr. 650.)

In December 2006, an EMG was positive for moderate bilateral median neuropathies at

the wrist (carpal tunnel syndrome) and mild, predominantly sensory, peripheral neuropathy. (Tr. 422.) It also showed a chronic right C7 radiculopathy. (Tr. 423.) Lord underwent physical therapy and experienced an increase in flexibility, endurance, mobility, and strength, but no significant reduction in pain. (Tr. 330-64.)

In January 2007, Lord reported that physical therapy did not help and that his back pain continued. (Tr. 417.) An examination by Dr. Chad Stephens of Orthopaedics Northeast yielded pain with trunk flexion and extension, side-bending, and rotation, and an equivocal straight leg raise bilaterally; all other clinical findings were essentially normal. (Tr. 418.) In February 2007, a discogram indicated an abnormal study with concordant discogenic back pain at L3-4 and L4-5. (Tr. 397.) Lord underwent a steroid injection and a lumbar discogram later that month. (Tr. 396-98, 408-11.)

In April 2007, an MRI showed a small rightward L1-L2 disk protrusion without spinal stenosis, a diffuse disk bulge with a left lateral annulus tear at L2-L3, and a previously fused L5-S1 disk space. (Tr. 499-500.) Dr. Arata noted that Lord's MRI "looked good," that further surgery was not indicated, and that Lord's pain should be treated conservatively. (Tr. 629, 631, 840.) He ordered further imaging of Lord's lumbar spine in order to "try and determine if there is any obvious explanation for his complaints of low back pain." (Tr. 631.)

Lord saw Dr. Jay Patel, a psychiatrist, four times between October 2006 to May 2007, and he also saw a counselor several times at Dr. Patel's office. (Tr. 432-39.) He noted that Lord had low average intelligence, poor insight, and poor judgment. (Tr. 439.) Dr. Patel assigned a GAF of 50 and diagnosed Lord with major depression, an impulse control disorder, a possible personality disorder, and borderline intellectual ability. (Tr. 439.) In January 2007, Dr. Patel

stated that Lord's drug tolerance, especially for pain medication, was "very high" and that he needed to change his attitude in order to better accept his back problems since there is no complete cure. (Tr. 436.)

In June 2007, J. Gange, Ph.D., a state agency psychologist, reviewed Lord's record and opined that he was moderately limited in social functioning and in maintaining concentration, persistence, or pace, and mildly restricted in daily living activities. (Tr. 736-52.) He further concluded that Lord was moderately limited in his ability to carry out detailed instructions, work in coordination with or proximity to others without being distracted, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and travel in unfamiliar places or use public transportation. (Tr. 736-37.) Lord was not significantly limited, however, in any other mental activities. (Tr. 736-37.) Dr. Gange concluded that Lord retained the capacity to perform simple, repetitive tasks on a sustained basis without special considerations. (Tr. 738.) His opinion was later affirmed by a second state agency psychologist, Donna Unversaw, Ph.D. (Tr. 825.)

That same month, Dr. R. Fife, a state agency physician, reviewed Lord's record and concluded that he could lift ten pounds frequently and twenty pounds occasionally; stand or walk six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 728-35.) He further opined that Lord needed to avoid concentrated exposure to wetness and hazards, including machinery and heights. (Tr. 732.) Dr. Fife's opinion was later affirmed by a second state agency physician. (Tr. 875.)

In July 2007, Dr. Arata noted that, even though Lord continued to complain of pain, x-rays and imaging studies of Lord's back were mostly normal. (Tr. 837.) He stated that the only

way to identify the source of his pain was to surgically explore the fusion mass, which he did in September 2007. (Tr. 805, 814-19, 837.)  Dr. Arata documented on October 31, 2007, that Lord continued to complain of "a lot of back pain despite fairly good looking x-rays that were taken today of the lumbar spine." (Tr. 830, 833.)

Also in September 2007, Lord was referred to Park Center and was evaluated by Glenis Sundberg. (Tr. 785-89.)  She documented that Lord's appearance and behavior were appropriate; his insight, judgment, and thought content normal; and his mood and affect angry and depressed. (Tr. 786-87.)  Some immediate memory problems were noted. (Tr. 787.)  She diagnosed him with major depression, recurrent and moderate, and assigned a GAF of 53. (Tr. 788.)

The following month, Lord was evaluated by Catherine Duchovic, a psychiatric nurse at Park Center. (Tr. 782-84.)  Lord's mood was depressed, and his affect angry. (Tr. 782.)  He exhibited poor judgment and minimal insight; his speech was pressured with flight of ideas; and his thought content was blaming of others. (Tr. 782.)  He also had some memory problems. (Tr. 782.)  He had suicidal ideation and homicidal ideation towards those who "disrespected" him. (782.)  She assigned him a GAF of 53 and diagnosed him with a major depressive disorder, recurrent, moderate; opiate dependence; and an anti-social personality disorder. (Tr. 784.)

Also in October 2007, Lord was assessed by Wayne J. Von Bargen, Ph.D. (Tr. 821-22.) On mental status exam, Lord was able to do simple math calculations, and his cognitive functioning appeared grossly intact. (Tr. 822.)  Dr. Von Bargen assigned Lord a GAF of 50 and diagnosed him with a depressive disorder, pain disorder, rule-out cognitive disorder, and a personality disorder. (Tr. 822.)

In December 2007, Lord was voluntarily hospitalized for one week at Parkview

Behavioral Health due to his anger problems. (Tr. 1186.) He had been having homicidal rage towards his internist, pain management physician, and orthopaedic surgeon and wanted to "disable them." (Tr. 1186.) He was mad at his internist for failing to supply the pain medications that he wanted, and while hospitalized, he sought pain medications. (Tr. 1187.) On mental status examination, Lord was pleasant and cooperative, his thought associations were intact, and his orientation and memory were unremarkable; his insight and judgment, however, were marginal, and he was preoccupied with his back pain. (Tr. 1187.) While hospitalized, Lord "contracted for safety" and attended group and individual therapies. (Tr. 1187.)

A January 2008 MRI of Lord's lumbar spine described his past fusion surgical site as having a "good appearance" and his remaining degenerative changes as "slight" or "mild." (Tr. 1218.) These results were supported by an x-ray of the lumbar spine performed in February. (Tr. 1221.) Lord continued to receive steroid injections in 2008 and 2009 from Dr. William Hedrick, a pain management physician, who diagnosed him with failed back and chronic pain syndromes. (Tr. 1052, 1066, 1070-71, 1087, 1091, 1105, 1123-24, 1128.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial

evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On March 9, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 25-34.) He found at step one of the five-step analysis that Lord had not engaged in substantial gainful activity after his alleged onset date, and at step two, that his degenerative disk disease, peripheral neuropathy, depression, and personality disorder were severe impairments. (Tr. 27.) At step three, the ALJ determined that Lord's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 28.)

Before proceeding to step four, the ALJ determined that Lord's symptom testimony was not credible to the extent it portrayed limitations in excess of the following RFC:

> [T]he claimant has the residual functional capacity to perform sedentary work . . . except he should be able to sit and stand as needed to alleviate pain; should avoid concentrated exposure to wetness and hazards; and is limited to unskilled work requiring only occasional contact with the public.

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

(Tr. 30.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Lord was unable to perform any of his past relevant work. (Tr. 33.) The ALJ then concluded at step five that he could perform a significant number of sedentary jobs within the economy, including inspector, packer, and assembler. (Tr. 34.) Accordingly, Lord's claims for DIB and SSI were denied. (Tr. 34.)

### C. The ALJ's Step Five Finding Is Supported by Substantial Evidence

Lord first argues that the ALJ erred when assigning his RFC and posing a hypothetical to the VE at step five, contending that the ALJ failed to account for his moderate deficiencies in maintaining concentration, persistence, or pace. Lord's argument, however, does not warrant a remand of the Commissioner's final decision.

To explain, at step two of the five-step sequential analysis, the ALJ must determine whether a claimant's impairment(s) is "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). In determining the severity of a claimant's mental impairments at step two of his five-step analysis, the ALJ addresses the claimant's degree of functional limitation in four "broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); *see Jones v. Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *13 (W.D. Wis. Oct. 18, 2001). The Seventh Circuit Court of Appeals has stated that the ALJ must then "incorporate" these limitations into the hypothetical questions posed to the VE at step five. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) (finding that the ALJ erred when his hypothetical question to the VE failed to take into account his finding at step two that the claimant had

12

deficiencies in social functioning and concentration, persistence, and pace); *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004) (remanding case where the ALJ failed to adequately account for the claimant's social limitations in the RFC); *see also Kasarsky v. Barnhart*, 335 F.3d 539, 543-44 (7th Cir. 2003). Stated more broadly, "to the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate *all* relevant limitations from which the claimant suffers." *Kasarsky*, 335 F.3d at 543-44 (emphasis added).

At step three, the ALJ found that Lord had moderate difficulties in social functioning and in maintaining concentration, persistence, or pace, as well as minimal difficulties in activities of daily living. (Tr. 28-29.) After determining that Lord's mental impairments were significant enough to be "severe" but not severe enough to meet a listing-level impairment, the ALJ assigned him an RFC limiting him to "unskilled work requiring only occasional contact with the public." (Tr. 30.) Contrary to Lord's argument, in this instance the ALJ adequately accounted for his deficiencies in maintaining concentration, persistence, or pace by assigning him this limitation in the RFC, which was then adequately incorporated into the ALJ's hypothetical to the VE. (*See* Tr. 84-85, 87.)

Significantly, in assigning the RFC for unskilled work requiring only occasional contact with the public, the ALJ relied, at least in part, upon the opinion of Dr. Gange, the state agency psychologist who reviewed Lord's record and concluded that although he had moderate difficulties in social functioning and in maintaining concentration, persistence, or pace, he could still perform work involving simple, repetitive tasks on a sustained basis without special considerations. (Tr. 738, 750.) Dr. Gange's opinion was later affirmed by a second state agency psychologist, Dr. Unversaw.

The instant circumstances are analogous to the facts confronting the Seventh Circuit in *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002).[6]  There, the ALJ determined that the claimant was moderately limited in his ability to maintain a regular schedule and attendance and in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. *Id.*  In posing a hypothetical to the VE, the ALJ relied upon the opinion of a consulting physician who stated that because the claimant was not significantly limited in seventeen of twenty work-related areas of mental functioning, he retained the mental RFC to perform "low-stress, repetitive work." *Id.*  The Court of Appeals concluded that the ALJ's limitation to low-stress, repetitive work adequately incorporated Johansen's moderate mental limitations, articulating that the consulting physician had essentially "translated [his] findings into a specific RFC assessment, concluding that Johansen could still perform low-stress, repetitive work." *Id.*; *see also Milliken v. Astrue,* 397 F. App'x 218, 221-22 (7th Cir. 2010) (unpublished) (affirming ALJ's step five finding where a medical expert opined that despite claimant's difficulties in social functioning and concentration, persistence, or pace, she could still perform unskilled work).

Here, like the consulting physician in *Johansen*, Dr. Gange essentially "translated [his]

---

[6] Lord, however, contends that the instant facts are more analogous to those presented in *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011), in which the Seventh Circuit found that a limitation to "sedentary" and "light" unskilled work was not sufficient to accommodate deficiencies in the claimant' ability to maintain regular work attendance, carry out instructions, and deal with the stresses of full-time employment.  But there is no indication in the *Jelinek* opinion that the state agency psychologists actually articulated that the claimant could perform simple, repetitive tasks like Dr. Gange did here.  Of course, "[t]he regulations, and this Circuit, clearly recognize that reviewing physicians and psychologist[s] are experts in their field and the ALJ is entitled to rely on their expertise." *Ottman v. Barnhart*, 306 F. Supp. 2d 829, 839 (N.D. Ind. 2004) (citing 20 C.F.R. § 404.1527(f)(2)(i)).  Therefore, *Jelinek* is distinguishable from the instant circumstances.

The facts at hand are also distinguishable from those presented in *O'Connor-Spinner*, 627 F.3d at 617-18.  There, the ALJ failed to incorporate all of the mental limitations assigned in the RFC into the hypothetical posed to the VE at step five. *Id.*  Here, the hypothetical posed by the ALJ to the VE at step five adequately reflects all of the limitations assigned in the RFC. (*Compare* Tr. 84-87, *with* Tr. 30.)

findings into a specific RFC assessment." 314 F.3d at 288. That is, Dr. Gange concluded that, despite Lord's moderate difficulties in social functioning and in maintaining concentration, persistence, or pace (Tr. 750), he could still perform simple, repetitive tasks on a sustained basis without special considerations (Tr. 738).

Admittedly, the ALJ's RFC does not reflect Dr. Gange's specific translation of his clinical findings because it limits Lord to "unskilled work," rather than "simple, repetitive tasks." Indeed, some courts have stated that "[o]nly if a doctor used the descriptive language to describe what work a claimant can perform in spite of his limitations can the ALJ use those terms in the RFC or hypothetical questions to the VE." *Coots v. Astrue*, No. 08-cv-2197, 2009 WL 3097433, at *8 (C.D. Ill. Sept. 22, 2009) (citing *Johansen*, 314 F.3d at 289); *see also Conley v. Astrue*, 692 F. Supp. 2d 1004, 1008-09 (C.D. Ill. 2010). And, the Seventh Circuit has found a hypothetical flawed where it "purported to tell the vocational expert what types of work [the claimant] could perform rather than setting forth [the claimant's] limitations and allowing the expert to conclude on his own what types of work [the claimant] could perform." *Young*, 362 F.3d at 1004 n.4; *see also Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009); *Everroad v. Astrue*, No. 4:06-cv-100, 2007 WL 2363375, at *8 (S.D. Ind. Aug. 10, 2007) ("By using conclusory language to describe Mr. Everroad's limitations, the ALJ did not allow the expert to make a reliable determination about what work the claimant could perform.").

Yet, although it would have been most prudent for the ALJ to mirror Dr. Gange's translation with specificity, in this particular instance the ALJ's RFC for "unskilled work requiring only occasional contact with the public" is adequately supported by the record. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("[N]o principle of administrative law or

common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").  "Unskilled work" is defined in the regulations as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §§ 404.1568(a), 416.968(a); *see Jelinek*, 662 F.3d at 813-14.  The Social Security Administration further articulated that the following mental activities are generally required to perform unskilled work: understanding, remembering, and carrying out simple instructions; making judgments that are commensurate with the functions of unskilled work (i.e., simple work-related decisions); responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. SSR 96-9p, 1996 WL 374186, at *9; *see Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008) ("[W]here the claimant has the ability to understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting, then an RFC of 'unskilled' work would be appropriate.").

Here, Dr. Gange's opinion specifically addressed Lord's limitations with respect to these mental activities.  He opined that Lord was "not significantly limited" in fifteen of twenty categories of mental activities, including the ability to understand, remember, and carry-out simple instructions; make simple work-related decisions; interact appropriately with the general public and maintain socially appropriate behavior; and respond appropriately to changes in the work setting. (Tr. 736-37.)  The only relevant categories that Dr. Gange found Lord to be "moderately limited" in was the ability to work in coordination with or proximity to others without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting

behavioral extremes. (Tr. 736-37.) In fact, Dr. Gange specifically articulated that the mild limitations Lord experienced in his activities of daily living were primarily attributable to his physical problems. (Tr. 738.)

To reiterate, "an ALJ is free to formulate his mental residual functional capacity assessment in terms such as 'able to perform simple, routine, repetitive work' so long as the record adequately supports that conclusion." *Kusilek v. Barnhart*, No. 04-C-310-C, 2005 WL 567816, at *4 (W.D. Wis. Mar. 2, 2005); *see Johansen*, 314 F.3d at 289 ("All that is required is that the hypothetical question [to the VE] be supported by the medical evidence in the record." (quoting *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987))). Because Dr. Gange translated Lord's moderate difficulties in social functioning and in maintaining concentration, persistence, or pace into an RFC that reflected the capacity to perform the mental activities identified by the Social Security Administration for "unskilled work," substantial evidence supports the ALJ's step-five finding. *See, e.g.*, *Orucevic v. Astrue*, No. C07-1981 CRD, 2008 WL 4621420, at *7 (W.D. Wash. Oct. 16, 2008) (affirming the ALJ's decision limiting the claimant to "unskilled" work where the record indicated she could perform "simple, repetitive tasks," observing that the Social Security Administration's definition of "unskilled" work "describes repetitive tasks as the primary work duty"); *Karger v. Astrue*, 566 F. Supp. 2d 897, 909 (W.D. Wis. 2008) (affirming ALJ's decision where the record indicated that the claimant had the prerequisite mental abilities necessary to perform "unskilled" work).

Therefore, Lord's first argument—that his RFC and the hypothetical posed to the ALJ at step five did not account for his moderate difficulties in concentration, persistence, or

17

pace—does not warrant a remand of the Commissioner's final decision.[7]

## D. The ALJ's Credibility Determination Will Not Be Disturbed

Lord also contends that the ALJ erred by discounting the credibility of his symptom testimony concerning his impairments. Lord's challenge to the ALJ's credibility determination is ultimately unpersuasive.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman*, 306 F. Supp. 2d at 838, creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Contrary to Lord's assertion, the ALJ thoroughly considered the evidence of record pertaining to his physical and psychological conditions when assessing the credibility of his

---

[7] Lord also raises a cursory argument that an RFC for unskilled work is inconsistent with the GAF score of 50 assigned by Dr. Patel and Dr. Von Bargen. (Opening Br. 14; Reply Br. 9.) But "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on [his] GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citation and internal quotation marks omitted); *accord Walters v. Astrue*, 444 F. App'x 913, 919 (7th Cir. 2011) (unpublished). Rather, "GAF scores are more probative for assessing treatment options rather than determining functional capacity and a person's disability." *Curry v. Astrue*, No. 3:09-cv-565, 2010 WL 4537868, at *7 (N.D. Ind. Nov. 2, 2010). The ALJ specifically mentioned Lord's GAF score of 50, and thus certainly did not turn a blind eye to such evidence. (Tr. 32); *cf. Ingle v. Astrue*, No. 10-cv-1002, 2011 WL 5834273, at *7 (S.D. Ill. Oct. 28, 2011) (finding that the ALJ erred by "cherry-picking" the claimant's highest GAF score and ignoring the remaining scores). Therefore, Lord's terse argument concerning the GAF score of 50 is not pivotal.

subjective complaints. The ALJ first catalogued the objective medical evidence concerning Lord's back impairment, observing that the CT scans, MRIs, and x-rays failed to support the severity of his pain complaints. (Tr. 31.) Specifically, the ALJ noted that when Lord's treating physicians examined his objective test results in 2007, they commented that his complaints appeared to be greater than warranted by his x-rays, that the MRIs for his spine "looked good," and that additional surgery was not indicated. (Tr. 31.) The ALJ further considered that a 2008 MRI of Lord's lumbar spine described his past fusion surgery as having "a good appearance" and his remaining degenerative changes as "slight" or "mild." (Tr. 31 (citing Tr. 1218-25).)

And as to his psychological impairments, the ALJ thought that Lord's testimony of disabling concentration and memory problems was not supported by Dr. Von Bargen's consultative examination, which indicated that he was cooperative, logical, relevant, able to perform simple arithmetic calculations, and had grossly intact cognitive functions. (Tr. 29.) An ALJ is entitled to consider the objective medical evidence, or lack thereof, as a factor in assessing credibility and "may properly discount portions of a claimant's testimony based on discrepancies between [the c]laimant's allegations and objective medical evidence." *Crawford v. Astrue*, 633 F. Supp. 2d 618, 633 (N.D. Ill. 2009); *see Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000) ("[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility."); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); SSR 96-7p.

Even more significantly, the ALJ considered that Dr. Stensland, Lord's long-standing pain management physician, did not recommend any functional limitations or restrictions for

Lord. (Tr. 32.) Rather, Dr. Stensland stated in June 2006 that Lord's pain reports appeared to be greater than one would anticipate based on the functional levels he demonstrated. (Tr. 32 (citing Tr. 676).) By October 2006, Dr. Stensland had cleared Lord to return to work, limiting him only from truck driving. (Tr. 32.) Thus, the ALJ emphasized that while Dr. Stensland's restrictions precluded Lord from performing heavier level jobs, they did not restrict him from performing a limited range of sedentary work. (Tr. 32); *see generally McLachlan v. Barnhart*, No. 03 C 2297, 2004 WL 2036294, at *12 (N.D. Ill. Sept. 8, 2004) ("It is well established that Plaintiff has the burden of providing the evidence the ALJ will use in determining Plaintiff's residual functional capacity.").

The ALJ also weighed Lord's treatment history, which included fusion surgeries, numerous steroid injections, and significant amounts of narcotic pain medications. (Tr. 31-32; *see* Tr. 436); *see Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (emphasizing that the regulations expressly permit the ALJ to consider a claimant's treatment history when evaluating his credibility); 20 C.F.R. §§ 404.929(c)(3), 416.929(c)(3) (considering a claimant's use of medications and treatment measures as two factors in analyzing claimant's subjective symptoms); SSR 96-7p. The ALJ specifically noted that Dr. Patel documented that Lord had a very high tolerance for pain medication. (Tr. 31; *see* Tr. 436 ("I think his tolerance for drug[s] is very high, especially the pain medication.").) At the same time, the ALJ observed that Lord also has a history of failing to cooperate with his treating sources, which the ALJ thought suggested that his symptoms may not be as severe as alleged in connection with his DIB application. (Tr. 31); *see Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010) (considering claimant's failure to adhere to treatment recommendations in discounting her credibility); *Schmidt v. Astrue*, 496 F.3d

833, 844 (7th Cir. 2007).

Lord criticizes the ALJ for discounting his credibility on this basis without first inquiring about the reasons for his noncompliance in accordance with Social Security Ruling 96-7p.  He points out that he was hospitalized for mental problems, specifically his homicidal rage towards his treating physicians, and that the ALJ erred by not asking him about his ill feelings toward doctors as a possible reason for his noncompliance. (Reply Br. 8.)  Contrary to his assertion, Lord *did* testify at the hearing about his anger toward the physicians, and the ALJ then further inquired about it. (Tr. 61, 75, 79.)  In fact, the ALJ specifically acknowledged this issue in his decision, articulating that Lord had expressed anger toward Dr. Arata and consequently was told to never come back; the ALJ also considered Lord's testimony that caring for his dog helped to alleviate these "prior homicidal feelings." (Tr. 31, 67.)  Thus, the ALJ indeed considered Lord's anger toward his physicians before discrediting him for noncompliance.

Lord, citing *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006), further argues that an ALJ should not discount the credibility of a claimant with mental problems on the basis of noncompliance.  Indeed, "mental illness in general . . . may prevent the sufferer from taking [his] prescribed medicines or otherwise submitting to treatment." *Id.*  But in this instance there is no indication that the ALJ failed to adequately consider this possibility; nor does Lord point to any evidence in the record in support of his suggestion that his mental impairments caused his noncompliance. (*Cf.* Tr. 436 ("[H]e blames his back for all problem[s] and reality is that the patient is right but his attitude must change.  Otherwise, there is no complete[] cure for [the] back problem and if he does not accept that, he is always going to have trouble."), 437-39); *see, e.g., Noyes v. Astrue*, 1:07-cv-228, 2008 WL 3463247, at *13 (N.D. Ind. Aug. 12, 2008)

("Though Noyes would like to attribute her noncompliance to the episodic nature of her mental illness, she fails to point to any medical opinion in the record that excuses her noncompliance based on this premise."). Moreover, Lord's noncompliance was just one of several factors that the ALJ considered when assessing his credibility.

The ALJ also considered Lord's activities of daily living, concluding that he had just mild limitations in this area. (Tr. 28, 30.) The ALJ noted that Lord independently completes a variety of household tasks each day, including caring for his dog, going to the store, cooking light meals, doing the dishes, vacuuming, doing the laundry, and watching television. (Tr. 28); s*ee Schmidt v. Astrue*, 395 F.3d 737, 746-47 (7th Cir. 2005) (considering claimant's performance of daily activities as a factor when discounting claimant's credibility); 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p. The ALJ also weighed Lord's testimony that his back pain causes him to lie down for three to four hours each day. (Tr. 28, 30.) Thus, the ALJ did not cherry-pick the evidence concerning his pain and daily living activities, but rather, considered the record fairly. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) ("If the ALJ were to ignore an entire line of evidence, that would fall below the minimal level of articulation required.").

Furthermore, the ALJ also took note of certain inconsistencies in the record. He observed that although Lord testified that he does not have any friends, does not belong to any social organizations, and has problems getting along with others, Ms. Reynolds, his friend and landlord, represented that he spends a significant amount of time with her each day (at least six hours) and also talks with an old friend on the phone occasionally. (Tr. 29; *see* Tr. 243, 248, 249); SSR 96-7p. Additionally, the ALJ considered Ms. Reynold's representation that Lord's

social activities had not changed since the onset of his impairments (Tr. 249), and thus he reasonably inferred that Lord's social problems were "independent of his impairments." (Tr. 29); *see Stevenson*, 105 F.3d at 1155 ("The ALJ was entitled to make reasonable inferences from the evidence before him . . . .").

Moreover, the ALJ did indeed credit Lord's symptom testimony to a significant extent, acknowledging that his pain and psychological impairments certainly cause him some limitations. Accordingly, to accommodate his back pain, the ALJ assigned an RFC for sedentary work with a sit-to-stand option. And, for his psychological problems, the ALJ limited him to unskilled work requiring only occasional contact with the public. *See Schmidt v. Astrue*, 496 F.3d 833, 844 (7th Cir. 2007) ("[T]he ALJ did not totally discount Schmidt's testimony regarding how her pain affected her ability to perform certain activities, as evinced by the ALJ's decision to limit Schmidt's range of work to sedentary when assessing her residual functional capacity."); *Vincent v. Astrue*, No. 1:07-cv-28, 2008 WL 596040, at *16 (N.D. Ind. Mar. 3, 2008) (affirming the ALJ's credibility determination where he discredited the claimant's symptom testimony only in part).

In short, none of the arguments advanced by Lord in challenging the ALJ's credibility determination are worthy of a remand. Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, will not be disturbed.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The

Clerk is directed to enter a judgment in favor of the Commissioner and against Lord.

SO ORDERED.

Enter for this 19th day of September, 2012.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge